## BASIL B. WELLS, Inc. v. COUNTY COURT OF CABELL COUNTY, W. VA., et al.

### No. 552.

United States District Court
S. D. West Virginia, Huntington Division.

March 30, 1951.

Steptoe & Johnson, Stanley C. Morris and Charles W. Yeager, all of Charleston, W. Va., Anderson & Barnes and Wilson K. Barnes, all of Baltimore, Md., for plaintiff.

Campbell & McNeer, Selden S. McNeer, Robert K. Emerson and Edward H. Greene, all of Huntington, W. Va., for defendants.

WATKINS, District Judge.

This action grows out of a contract between plaintiff and defendants under which the plaintiff corporation undertook to clean and paint a bridge crossing the Ohio River at Huntington, W. Va., for the Cabell County Bridge Commission, an agency of the County Court of Cabell County, West Virginia. Plaintiff claims that the contract required it to remove only "unserviceable" paint and not all the paint before applying new paint. When the Bridge Commission stated that it would require the removal of all paint, plaintiff walked off the job. Plaintiff claims breach of its contract and asks damages of $30,533.44. In the alternative, plaintiff asks that the contract be cancelled, in which event it asks damages of $20,533.44. After plaintiff left the job, defendants re-advertised for bids and let the job to another contractor. Defendants contend that plaintiff breached the contract, and by way of counterclaim ask for damages against plaintiff of $52,119.63. The case was tried by the court without a jury.

Three questions are presented. (1) Was there a valid contract between the parties? (2) Did that contract require plaintiff to remove all the existing paint before applying new paint? Both of these questions must be answered in the affirmative. (3) Were the defendants guilty of any fraud or misrepresentation in procuring the contract? This question is answered in the negative.

Prior to the time the written contract was executed, a question was raised as to whether the contract required the removal

of all paint, or only the unserviceable paint, before the three new coats of paint were to be applied. The parties met together before the contract was signed to eliminate any possible misunderstanding about this matter. Plaintiff contends that it was assured by defendants or their representatives that only the unserviceable paint need be removed. Basil B. Wells and John Ernst testified directly to that effect. The defendants contend that plaintiff was told that all paint had to be removed, and that Wells or Ernst, president and vice-president, respectively, of the plaintiff company, agreed to undertake the job with this understanding. Six witnesses testified directly to that effect, including George H. Wright, Artie Holley, James Brady, Frank Heiner, members of the Cabell County Bridge Commission, and Benjamin W. LeSueur, and Harry M. Brown, engineers of the firm of J. E. Greiner Company, employed by the Commission to advise them as to the proper method of painting and otherwise maintaining the bridge. After hearing this conflicting testimony in open court, after weighing the evidence, and considering the credibility of the various witnesses, as disclosed by their interest in the outcome of the trial, the reasonableness of their testimony, their opportunity for knowing the facts about which they have testified, their prejudice or lack of prejudice, their demeanor on the witness stand, their experience and fairness, in the light of admitted facts, and all the surrounding circumstances, I make the following findings of fact and conclusions of law:

### Findings of Fact.

1. The bridge in question was constructed by a private corporation and was opened to the public as a toll bridge in 1926. It is of steel construction and has a total length of 2124 feet between abutments. In 1940 it was purchased by Cabell County, West Virginia, by the issuance of bonds secured by a trust indenture. It was thereafter operated and maintained by the Cabell County Bridge Commission under statutory authorization. At all times material to this action defendants George H. Wright, Artie Holley, James Brady, Frank Heiner and Ezra Midkiff were members of that Commission.

2. Major Herschel H. Allen, an experienced engineer and a partner of J. E. Greiner Company of Baltimore, Md., one of the outstanding engineering firms of the country, designed the bridge. By the terms of the trust indenture securing the bonds, this firm was to be employed by the County Court to inspect the bridge periodically and to make recommendations as to its operation and maintenance. Accordingly, the bridge was inspected annually by the engineering firm, which made appropriate recommendations to the County Court or the Bridge Commission with reference to maintenance of the bridge for the protection of the owner of the bridge and the bondholders.

3. The 1940 and 1941 inspections showed that the paint on the bridge was in poor condition. It had not been completely painted since it was built in 1926. The engineering firm recommended that areas of paint which no longer served to protect the metal be cleaned down to bare metal, primed with a coat of red lead and then covered with a finishing coat. This method of cleaning only the areas of damaged paint is known in the bridge painting trade as spot cleaning. The entire process of both cleaning the areas of damaged paint, priming with red lead and applying a finishing coat is known as spot cleaning and painting. Pursuant to this recommendation the bridge was spot cleaned. Red lead (which is a primer coat) was applied to the areas cleaned down to bare metal, and the entire bridge was then covered with a coat of green paint. The type of green paint recommended by the engineers could not be obtained due to wartime restrictions, with the result that an inferior substitute was purchased by the Commission and applied to the bridge.

4. In 1943 the engineers recommended that the bridge be spot cleaned again and that the spots so cleaned be primed again with red lead and another covering coat applied. The inspection in 1943 revealed a general failure of the green coat applied in 1942. Chemical analysis revealed that

this green paint contained certain harmful silicates which had been used as a filler by the manufacturer. Pursuant to this recommendation the Commission spot cleaned and spot painted the bridge in 1944. Each subsequent inspection revealed a progressive failure of the paint film. The 1947 report to the Commission contained the following recommendation: "This inspection has disclosed that a general breakdown and failure of the paint applied in 1942 is occurring over the entire bridge. It has further disclosed that disintegration of this paint coat is taking place under spot painting that was done during the summer of 1944. This indicates that any application of paint over existing coats is not economical and that before adequate protection of the metal can be provided the existing paint must be completely removed * * *."

On May 1, 1948, the annual report made by the engineering firm to the Commission contained the following recommendation: "The present bridge paint has deteriorated to such an extent that it must be replaced. It would not be advisable to attempt to save such portions of the surface as appear to be in good condition. The paint applied some six years ago has weathered badly and is subject to progressive cracking. This cracking would continue under any finish coats of new paint and would result in re-exposure of the steel. It is strongly recommended that *all the old paint* be removed and the surfaces thoroughly cleaned before applying *new paint*." (Emphasis supplied.)

The engineers who made this report are the same engineers who subsequently prepared the specifications for the painting contract. There can not be the slightest doubt as to the meaning of the words "old paint" in that recommendation. It is crystal clear that the words "old paint" were used to distinguish the existing paint from the "new" paint to be applied. This is the common sense interpretation of the words "old paint" in a contract which provided for the application of three coats of new paint. In the same report the engineers estimated the cost of cleaning and repainting the entire bridge at $75,000.00.

By 1948 the deterioration had progressed to such an extent that about 80% of the paint on the entire bridge no longer afforded a protective coating for the metal, and in 1949 the percentage was even higher.

5. In 1948 the Commission decided to follow these recommendations and authorized the Greiner engineering firm to prepare the necessary contract documents, including the specifications for cleaning and painting of the bridge. The contract and specifications were delivered to the Commission in 1948, but too late to advertise for bids that year. In April, 1949 the Commission advertised for bids and sent copies of the contract papers to plaintiff and other painting contractors. The contract documents, including specifications, were prepared by B. W. LeSueur. The specifications provided as follows:

"All surfaces of the metal shall be thoroughly and completely cleaned of all old paint, rust, stain, scale, dirt, grease and other foreign substance by means of an approved sand blast, pneumatic scaling tools, approved flame cleaning methods, metal brushes, scrapers or other effective means. All surfaces shall be cleaned to the satisfaction of the Engineer.

"No larger area shall be cleaned, in advance of painting, than will permit painting before rusting begins and if cleaned surfaces rust before painting can be done, they shall be recleaned by the contractor at his expense, so that the first coat of paint may be applied to absolutely rust-free surfaces."

The specifications also provided that all metal portions of the bridge be painted with three complete coats of paint, the first a red lead primer, the second a blue lead, and the third an aluminum finish coat. The red lead coat should only be applied to bare metal because its purpose is to prime or seal the steel from the air to prevent oxidation or rust. Bare steel will begin to rust within minutes from exposure to the air if a red lead primer is not promptly applied. That was the reason for the provision in the specifications to the effect that no larger area of steel should be cleaned at any one time, than

would permit prompt application of the first red lead coat to prevent rusting. Since the real purpose of red lead paint is to seal or prime the bare steel, it serves no useful purpose to apply red lead over old paint. Where old paint is left on the bridge to be painted over, there is no good reason to apply three new coats of paint.

6. In its annual inspection report dated May 2, 1949, after the contract and specifications had been prepared and advertised, the Greiner engineering firm again reiterated that all the old paint should be removed before new paint was applied, with one exception. That report stated: "It will suffice here to record that the present bridge paint has deteriorated beyond the point where it is feasible to attempt to save any portions of the surface that appear to be in good condition, with one exception. Painting throughout is essential and urgent. The paint on the underside of I-Beam Lok roadway is in good condition except at each floor beam, where water has penetrated the construction joints and along the seams on each side of the sidewalk and on the west side of the roadway. Where the paint is good it may be saved and the number of necessary coats revised."

No evidence was offered to show the percentage which the surface area of the I-Beam Lok roadway bears to the underside of the bridge or to the entire surface of the bridge. However, the Commission had already decided that they wanted all the paint removed, specifications had been prepared and submitted to contractors requiring the removal of all old paint, and these specifications were never changed to permit of any exception to this requirement. The number of necessary coats of paint was never revised. The Commission felt that it would be an expensive job to remove all the existing paint before applying new paint, but that is the kind of job which it wanted.

7. Sometime after the contract documents had been sent to prospective bidders, it was discovered that sections 4 through 7 of "Instructions to Bidders" had been omitted, whereupon the Commission sent an addendum containing the missing sec-

tions by registered mail to all bidders, which addendum was received by plaintiff about May 16. The specifications, as amended, contained the following provision: "No interpretation of the meaning of the specifications or other contract documents will be made to any bidder orally. Every request for such interpretation should be made in writing addressed to the Cabell County Bridge Commission, P. O. Box 388, Huntington, West Virginia, and to be given consideration must be received at least five (5) calendar days prior to the date fixed for the opening of bids. Any and all such interpretations and any supplemental instructions will be in the form of written addenda to the specifications which, if issued, will be mailed by registered mail with return receipt requested to all prospective bidders * *."

8. On May 24, 1949, the Commission opened the bids. Three of them did not comply with the instructions to bidders and were rejected. The following bids were received:

| | |
|---|---|
| Klicos Painting Co., Inc. | $59,400.00 |
| Basil B. Wells, Inc. | 69,710.00 |
| Pennsylvania Painting Co. | 85,760.00 |
| P. N. Spanos & Sons, Inc. | 103,359.00 |
| Walker Paint Co. | 115,412.00 |
| Arthur M. Gelden | 137,853.00 |
| Diniaco Brothers | 141,390.00 |
| G. N. Spanos & Son, Inc. | 156,394.00 |
| Central Contracting Co. | 173,600.00 |

After the bids were opened Nick G. Klicos of Klicos Painting Company, Inc., the low bidder, talked to Nick Diniaco, another bidder, about their bids. Diniaco advised Klicos that the specifications required the removal of all paint down to bare metal. Klicos then came before the Commission and asked to withdraw his bid before it was opened. When learning that his bid had already been opened he explained to the Commission that he had misread the specifications; that he had intended to only remove the blistered paint and did not "figure any sand blasting there." Klicos asked to withdraw his proposal. The Commission, and LeSueur, the engineer who prepared the specifications, who was also present, told Klicos that the specifications did require the removal of

all paint down to bare metal. He was told that the Commission would take his request under consideration.

9. The Commission was disturbed by this error and requested LeSueur to communicate with plaintiff, who was the second low bidder, to see if it understood that the specifications required that all paint had to be removed down to bare metal. In the presence of the Commission, LeSueur telephoned the Greiner office in Baltimore and talked with H. M. Brown, a partner in the Greiner firm. Brown was a graduate engineer with 36 years' experience, much of it in bridge engineering, including the preparation and interpretation of specifications for cleaning and repainting bridges. LeSueur explained to Brown that Klicos had submitted his bid on the basis of a spot cleaning job, and asked Brown to communicate with the plaintiff, also located in Baltimore, and determine whether plaintiff had submitted its bid with the understanding that all paint had to be removed and was willing to accept a contract on that basis. Brown immediately telephoned plaintiff's office, and in the absence of Basil B. Wells, plaintiff's president, talked with John Ernst, vice president, who had prepared plaintiff's bid. Brown explained what had occurred in Huntington with reference to the Klicos bid, and stated that plaintiff was the next low bidder. After some conversation as to the necessity of removing all the paint, Brown asked Ernst if plaintiff was willing to enter into a contract based on the removal of all paint to bare steel. Ernst replied that plaintiff's bid had been based on removing all paint to the bare steel with the possible exception of some of the floor system, but that plaintiff was willing to enter into the contract with the understanding that all paint was to be removed. Brown made a written memorandum of the conversation at the time or shortly thereafter, which memorandum is in evidence. Ernst denied this conversation. Brown then called LeSueur in Huntington and told him of this conversation with Ernst. LeSueur then informed the Commission that his office in Baltimore had been assured by the plaintiff that plaintiff intended to remove all the paint from the bridge.

10. The Commission decided to release Klicos and to award the contract to plaintiff if it could furnish the required bond. Neither Ernst nor Wells had seen the bridge at the time the "job was figured" by Ernst. They testified that the bridge was inspected by plaintiff's foreman, Meekins, and another man, but neither of these men testified.

11. Both Wells and Ernst came to Huntington on June 6, 1949 to make sure that they had not "mis-estimated this job". Upon arrival there they went to see George H. Wright at his store. Wright explained to Wells that the Commission wanted all the paint removed, and Wells assured him that "they were prepared and had bid expecting to remove all the paint". Wells denied these statements and Ernst said that he could not remember the conversation.

12. Wright then took Wells and Ernst to the Court House to meet Holley, Brady and Heiner, who were members of the County Court of Cabell County which had been in session that morning. Heiner and Holley both explained to Wells that the low bidder had asked to be released because he based his bid on only a spot cleaning job. Both of them explained to Wells that the Commission wanted all the paint removed. Heiner and Holley both testified that they each asked Wells the specific question as to whether he understood that all the paint had to be removed down to bare steel. Wells told each of them that he understood that all the paint had to be removed and that he could do the job that way and still make money. Wright and Brady testified to the same effect. During the meeting Wells had stated that he would take all the paint off but he did not think it necessary. He was told in the meeting that the Commission wanted all the paint removed and no other kind of a job. After the meeting was over Brady testified that he went to Wells and told him that "the only thing in the world this Commission is interested in, is, in the first place, removing all the paint from the bridge and applying three coats of paint".

Wells replied: "That's all right; we can do that and still make money". Both Wells and Ernst deny all of these statements. They testified that no one told them that they would be required to remove all the paint and that they did not agree to do so. They say that they returned to Baltimore still believing that only the removal of unserviceable paint was required.

13. About June 15, 1949, and prior to the execution of the contract on June 16, LeSueur met Wells and Ernst at the Maryland Club in Baltimore. Two subjects were discussed, the paint to be used by plaintiff and the scope of the cleaning specifications. Wells explained that he could not afford to remove all the paint at the price of his bid, but Ernst then told Wells that in figuring the bid he had included the removal of all paint. Wells and Ernst both deny that Ernst made this statement. Wells and Ernst both say that Wells told LeSueur that they would not undertake the job on that basis. Gaines McMillan, a representative of the bonding company engaged by plaintiff, also attended the meeting. He testified that after LeSueur told Wells that all the paint had to come off the bridge, Wells stated "I think I will throw up the job". Later Wells stated that he wanted to talk to Brown about the matter and arrangements were made to see Brown. At that meeting LeSueur stated to Wells that "it was the intention of the specifications to remove all of the paint from the bridge and that if his bid had not enough money in it to do that, or if he did not have any intention of doing that, then he should not sign the contract". Wells, Ernst and Mc-Millan confirm that LeSueur made this statement.

14. On June 16, 1949, the day following the meeting at the Maryland Club, plaintiff executed the contract and caused it to be mailed to the Thornburg Insurance Agency, Huntington, W. Va., with instructions to deliver it to the Commission. The letter of transmittal is dated June 16, 1949. It was received in Huntington on Saturday, June 18. Silas Wasserman, the Huntington agent of the bonding company,

tried to deliver it to the Commission that same day, but the office was closed and he delivered it on Monday morning, June 20. Wells and McMillan, the Baltimore agent of the bonding company, testified that the Huntington agent had been instructed to withhold delivery of the contract. The Huntington agent testified that he received no such instruction. The contract was regularly and properly delivered to the Commission by Wasserman with proper authority to do so. The Commission met and approved the contract the same day it was received, and directed Wright, its president, to sign the contract for the Commission, which was done.

15. On June 20, 1949, four days after the contract had been mailed to Huntington for unconditional delivery, and on the same day it was approved by the Commission, Wells, Ernst and Brown met at the offices of Greiner in Baltimore. Again Wells insisted that the removal of all paint was not necessary, and Brown explained that regardless of the necessity of removing all paint, the specifications required that all paint be removed. Wells and Ernst deny that Brown made such statement. Wells testified that Brown told him that he (Wells') interpretation of the specifications was correct. Ernst testified that Brown did not agree or disagree that only the unserviceable paint was to be removed.

16. Wells told Wright and Holley when he was in Huntington on June 6, 1949 that it would not be necessary for the Commission to hire an inspector on the job, but the Commission did hire the firm of Froebling & Robertson to serve as inspectors. A. J. Mobley of that firm served as inspector to see that the plaintiff complied with the specifications.

17. Plaintiff began work on the bridge about June 25, and thereafter until July 14, engaged in cleaning and painting the bridge strictly in accordance with the specifications. It removed all of the paint down to bare metal, and applied the primer coat of red lead as the specifications required. It did this without being told to do so, although some of the old or existing paint was in better condition than on any other portion of the bridge.

18. Plaintiff's foreman advised Mobley, the inspector, about July 14 that he was going to spot clean a portion of the bridge by means of a hand scraper and wire brush. Mobley told him he would not approve spot cleaning because the contract required removal of all paint. The foreman telephoned Wells, and Wells, Ernst and LeSueur came to Huntington the next day. Wells was again told that the specifications required removal of all paint. Plaintiff abandoned the work about July 16, 1949. Before leaving Huntington on July 14, Wells and Ernst wrote a letter to the Commission stating that plaintiff had intended to remove only "old paint which had ceased to be a protective coating" and would not remove other paint and that "the work was being stopped". Plaintiff never returned to the job to perform further work. Pursuant to the terms of the contract the Commission gave seven days' notice to the plaintiff that it had refused to continue with the work. On August 6, 1949, the Commission held a formal meeting at which the contract with plaintiff was terminated. After plaintiff abandoned the work the Commission took possession of the equipment and materials abandoned by the plaintiff at the site of the work, pursuant to the provisions of Subsection 1–13.01 of the contract.

19. The work was re-advertised. After competitive bidding P. N. Spanos & Company of Wheeling, W. Va., was determined to be the low bidder and secured the contract at a price of $121,500.00 The work was completed by Spanos and accepted by the Commission on November 22, 1950. The expenses of the Commission incident to re-advertising and re-letting were $329.-63.

20. Plaintiff agreed to do the work for $69,710.00. The difference between plaintiff contract price and the Spanos contract price (which latter was fully paid by the Commission to Spanos) is $51,790.00, making a total damage sustained by the Commission as a result of the breach of contract by plaintiff of $52,119.63.

21. There is no custom or usage in the bridge painting trade requiring the words "old paint" to be construed as unserviceable, damaged or non-adherent paint, or giving such words any meaning other than their usual and ordinary meaning.

22. Plaintiff was apprised of the fact, knew and understood before it entered into the contract, that the contract required the contractor to remove all existing paint from the bridge. There was no misunderstanding between the parties. There was a valid contract and meeting of the minds between the parties.

23. Neither the defendants nor their technical advisors made any fraudulent misrepresentations to the plaintiff. They did nothing to cause plaintiff to believe that it would be required to remove only unserviceable paint.

24. By refusing to remove all paint from the bridge and by walking off the job, plaintiff wrongfully breached its contract with defendants.

## Conclusions of Law

1. The words "old paint" as used in this contract mean existing paint. They must be read in connection with the other provisions of the contract. The contract provided for three new coats of paint. Such existing paint as remained on the bridge was described as old paint to distinguish it from the new paint to be applied under the contract.

2. After plaintiff's breach of contract defendants had the right under express terms of the contract to utilize, without charge therefor, plaintiff's equipment and supplies for completing the contract.

3. Plaintiff has failed to prove any breach of contract by defendants. Plaintiff is not entitled to damages and is not entitled to have the agreement cancelled. Defendants are entitled to recover from the plaintiff on its counterclaim the sum of $52,119.63.

## Discussion

The facts of this case speak so strongly that little discussion is necessary. I have not stated all the evidence in my findings of fact because much of it has little relevancy or materiality, and some of it I did not believe, and could not include in a

findings of fact. The question here is whether the contract required the removal of all paint or only a part of it, the unserviceable paint, before the three new coats of paint were to be applied, not what was necessary, expedient or most economical under the circumstances. When we read the whole contract in the light of existing circumstances the words of the contract themselves seem clear and unambiguous. If the words in question created any doubt on the part of plaintiff as to their meaning, the evidence is overwhelming that plaintiff was told time and time again that all existing paint had to be removed. When the parties to the contract met in Huntington (the members of the Bridge Commission in person, and the plaintiff, represented by its president and vice president), only a few days before the contract was signed, each of the four members of the Commission explained in no uncertain terms what they expected under the contract. Wells told them that plaintiff would remove all the paint and still make money. A few days later, after talking to some of the engineers, in which conversation he said that he could not afford to take the job at the bid price, and that removal of all the paint was not necessary anyway, he was told that if he could not remove all the paint he had better not sign the contract. The next day he signed and delivered the contract without any request for a change in its terms. If the engineers of J. E. Greiner Company, one of the outstanding bridge engineering firms in the country, told either Wells or Ernst that the specifications required only the removal of unserviceable paint, such statements certainly constituted a radical departure from all of their previous recommendations in their annual inspection reports.

The words "old paint" must be considered with other provisions of the contract. If one says that he is going to trade his old car in on a new one, he uses the word "old" to distinguish it from the new car, not for the purpose of declaring that it is deteriorated. It is an old car compared to the new one whether one year old or ten years old. It is significant that both Wells and Ernst in their testimony frequently use the words "old paint" to denote all the paint on the bridge, thereby giving the words their common and ordinary meaning in a contract providing for the application of three coats of new paint.

Plaintiff knew what terms were employed in the ordinary spot cleaning job. He read into the record typical specifications for a spot cleaning job which he had recently completed on the Susquehanna River Bridge. That contract required the removal of: "All paint that has deteriorated until it is in a dry, chalky or powdered state or is checked, cracked, scaled, blistered or peeled, shall be considered unacceptable and shall be removed by the method specified."

The fact that the specifications provided for the application of three coats of paint is significant. Common sense would indicate that there would be no purpose in adding three coats of paint, including a red lead primer coat, over old paint.

Both Wells and Ernst knew that the low bidder had been released because he did not bid with the expectation of removing all the paint. This was known to them as early as May 26 or 27 and was reported to them by LeSueur on June 15, the day before the contract was signed. The Commission was agreeing to pay $10,000.00 more than the low bid, and plaintiff knew that fact. What was the purpose in paying this additional $10,000.00 if plaintiff was only to perform a spot cleaning job as the low bidder proposed to do?

It is also very significant that plaintiff removed all the paint from the bridge as far as he went in the performance of his contract without any instructions from the defendants. What the intentions of Wells were in signing the contract is a matter of conjecture. It would seem that he either thought he could remove all the paint for the price bid, or that he hoped to be able to convince the Commission that removal of all the paint was not necessary.

Counsel may submit an appropriate order.